J-S51004-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA

v.

KYLE DOLAN

Appellant

:
:
:
:
:
:
:
:
:
:
:
:

IN THE SUPERIOR COURT OF
PENNSYLVANIA

No. 36 MDA 2019

Appeal from the Judgment of Sentence Entered December 13, 2018
In the Court of Common Pleas of Centre County
Criminal Division at No(s):  CP-14-CR-0001722-2017

BEFORE:  PANELLA, P.J., GANTMAN, P.J.E., and MUSMANNO, J.

MEMORANDUM BY PANELLA, P.J.:               **FILED NOVEMBER 07, 2019**

Kyle Dolan appeals from the judgment of sentence imposed on December 13, 2018, in the Centre County Court of Common Pleas. Prior to sentencing, the trial court, sitting as fact-finder, convicted Dolan of one count of driving under the influence ("DUI") of a Schedule II or Schedule III controlled substance – second offense, **see** 75 Pa.C.S.A. § 3802(d)(1)(ii), one count of DUI impairing his ability to safely drive or operate his vehicle, **see** 75 Pa.C.S.A. § 3802(d)(2), and one count of possession of drug paraphernalia, **see** 35 P.S. § 780-113(a)(32). The court sentenced Dolan to five years of intermediate punishment consecutively followed by twelve months of probation. On appeal, Dolan claims the trial court erred in failing to grant his motion to suppress his blood test results based on lack of consent. **See** Appellant's Brief, at 4. After review, we affirm the judgment of sentence.

As recounted by the trial court:

On May 12, 2017[,] at approximately 4:04 p.m., Officer Kurt Stere was dispatched to a two-vehicle accident at the 1400 block of East College Avenue in State College[,] Pennsylvania. Officer Stere arrived at the accident scene at 4:11 p.m.[,] and EMS arrived at approximately the same time. When Officer Stere arrived, both vehicles were still in the roadway[,] and EMS determined that Kyle Dolan … was in need of medical attention.

Officer Stere observed that one vehicle had rear end damage[,] and [Dolan's] vehicle had damage to the front end. While EMS evaluated [Dolan], Officer Stere spoke to the driver of the other vehicle to obtain his version of events, obtain his information, and provide him with a crash notification form. Officer Stere also spoke with a witness to the accident.

[Dolan] vomited while being evaluated by EMS. At some point during the EMS evaluation, [Dolan] refused medical treatment. After [Dolan] declined medical treatment, Officer Stere approached [Dolan] to obtain his version of events. While Officer Stere was speaking with [Dolan], he observed [Dolan] to be confused, dazed, and on the nod. [Dolan]'s eyelids were droopy, [Dolan] had difficulty keeping his eyes open, and [Dolan] was unable to explain his version of events.

After making these observations, Officer Stere was concerned that [Dolan] was under the influence of some type of controlled substance. Officer Stere did not believe [Dolan] was under the influence of alcohol, as there was no smell of alcohol on his breath. Several times during Officer Stere's conversations with [Dolan], [Dolan] asked if he could leave the scene. Officer Stere indicated that [Dolan] could not leave.

…

Officer Stere had only been on patrol for two weeks at the time of this incident and was not trained to conduct field sobriety tests. Because of this, Officer Stere contacted Officer Diedre Houck to assist his investigation of the accident as soon as he was notified that Officer Houck was available to respond to calls[.] Officer Houck was also not trained to conduct field sobriety tests, but as she travelled to the scene of the accident, she requested Patton Township Officer Brian Shaffer respond to the scene. Officer Shaffer documented in his [drug recognition expert] report that Officer Houck contacted him at 4:53 p.m.

Officer Houck arrived at the scene within minutes[.] While Officers Houck and Stere waited for Officer Shaffer to arrive, they spoke to [Dolan]. [Dolan] claimed to be travelling from [the Central Pennsylvania Institute of Science and Technology] in Bellefonte to Texas Roadhouse in State College. Officers Houck and Stere noted that this information did not seem truthful, as it did not match the direction of travel of [Dolan]'s vehicle. At some point in this conversation, [Dolan] admitted to having taken Suboxone[,] which was prescribed to him by a doctor.

…

When Officer Shaffer arrived between five and ten minutes after Officer Houck, he spoke to [Dolan] and noted that [Dolan]'s story of events did not seem to make sense. Officer Shaffer observed [Dolan] to have a low, raspy voice, constricted pupils and droopy eyelids. Officer Shaffer [having much experience administering field sobriety tests] conducted three standard field sobriety tests on [Dolan].

…

Upon completion of the tests, Officer Shaffer determined that [Dolan] was impaired and informed Officer Stere that there was probable cause to arrest [Dolan] for driving under the influence. Officer Shaffer offered [Dolan] the opportunity to complete a[n] … evaluation at the station[,] and [Dolan] agreed.

[Dolan] was then placed under arrest for [DUI,] and Officer Shaffer conducted a search of [Dolan]'s person. Officer Shaffer found a glassine baggie with white residue in [Dolan]'s pocket. The packaging was consistent with the packaging for street-level heroin. After placing [Dolan] in the patrol car, Officers Stere and Shaffer then searched [Dolan]'s vehicle where they found a glass pipe with marijuana residue inside of a shoe in the back seat, two small Ziploc baggies in the center console, and blue glassine baggie under the driver's seat.

Officer Stere transported [Dolan] to the Patton Township Police Department for the … evaluation. The station was between three and five mile from the scene of the accident. Before beginning the exam, Officer Shaffer removed the handcuffs from [Dolan]'s wrists and read [Dolan] his *Miranda* warnings.

[The] exam took between 40 and 45 minutes[.] … During the exam, Officer Shaffer observed several signs of intoxication which … allowed him to identify a category of substance causing [Dolan]'s intoxication. As a result of this exam [which uncovered at least eight signs of intoxication], Officer Shaffer opined that [Dolan] was under the influence of narcotic analgesics and cannabis.

…

Officer Stere then transported [Dolan] … to Mount Nittany Medical Center. Once at the hospital, Officer Stere removed the handcuffs from [Dolan] and read him the DL-26B form. This version of the form did not indicate that [Dolan] would be subject to any increase in criminal penalties if he refused a blood test. Officer Stere did not raise his voice, draw his weapon, or use any other form of force to get [Dolan] to agree to a blood draw. When asked if he had any questions, [Dolan] responded that he did not. [Dolan] signed the form consenting to a blood draw. The blood draw was performed at 7:19 p.m.

Trial Court Opinion and Order, 8/24/18, at 1-6 (formatting altered).

Several months later as a result of this incident, Dolan was charged with a total of three DUI and drug-related offenses. Thereafter, Dolan filed an omnibus pre-trial motion challenging, *inter alia*, the voluntariness of the warrantless blood draw performed on him. After a full briefing and hearing testimony, the trial court denied Dolan's motion. Dolan's case then proceeded to a non-jury trial, where he was found guilty of the three charged offenses.

Dolan filed a timely notice of appeal. Moreover, Dolan and the trial court both complied with the dictates of Pa.R.A.P. 1925. In this appeal, Dolan raises one question for our review:

1) Did the lower court err in denying [Dolan's] motion to suppress evidence obtained by a warrantless blood draw since any

- 4 -

purported consent given by [Dolan] was not rendered knowingly, intelligently or voluntarily, and was otherwise the product of intimidation, coercion, and/or duress?[1]

Appellant's Brief, at 4.

Dolan seeks suppression of the evidence obtained from the blood draw.

Our standard of review as to this type of challenge is well-settled:

Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the [trial court's] conclusions of law [ ] are subject to our plenary review.

_____

[1] Dolan does not suggest that there was a deficiency with the DL-26B form read to him. **See Birchfield v. North Dakota**, 136 S.Ct. 2160 (2016) (the United States Supreme Court holding that criminal penalties imposed on individuals who refuse to submit to a warrantless blood test violates the Fourth Amendment); **see also Commonwealth v. Giron**, 155 A.3d 635, 639 (Pa. Super. 2017) (our Court employing the **Birchfield** holding by establishing that enhanced criminal penalties imposed for failure to consent to a blood draw constituted an illegal sentence).

After **Birchfield** and **Giron**, 75 Pa.C.S.A. § 3804 was amended on July 20, 2017, to provide for enhanced criminal penalties only when police have obtained a search warrant for the suspect's blood. **See** 75 Pa.C.S.A. § 3804(c). Although the events in question occurred two months prior to this amendment, the DL-26B form here did not mention any increase in criminal penalties for failing to submit to a warrantless blood draw. Accordingly, it was statutorily compliant under this new version of the law.

Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress.

***Commonwealth v. Shreffler***, 201 A.3d 757, 763 (Pa. Super. 2018) (internal citation omitted).

In addition, we are guided by the fact that both the "Fourth Amendment to the [United States] Constitution and Article I, Section 8 of [the Pennsylvania] Constitution protect citizens from unreasonable searches and seizures." ***Commonwealth v. Evans***, 153 A.3d 323, 327 (Pa. Super. 2016) (citation omitted). "The administration of a blood test, performed by an agent of, or at the direction of the government, constitutes a search under both the United States and Pennsylvania Constitutions." ***Id***., at 328 (internal quotation marks and citation omitted). "A search conducted without a warrant is deemed to be unreasonable and therefore constitutionally impermissible, unless an established exception applies." ***Commonwealth v. Strickler***, 757 A.2d 884, 888 (Pa. 2000). "One such exception is consent, voluntarily given." ***Id***. (citation omitted).

> In determining the validity of a given consent, the Commonwealth bears the burden of establishing that a consent is the product of an essentially free and unconstrained choice—not the result of duress or coercion, express or implied, or a will overborne—under the totality of the circumstances. The standard for measuring the scope of a person's consent is based on an objective evaluation of what a reasonable person would have understood by the exchange between the officer and the person who gave the consent. Such evaluation includes an objective examination of the maturity, sophistication and mental or emotional state of the defendant. Gauging the scope of a defendant's consent is an inherent and necessary part of the process of determining, on the totality of the

circumstances presented, whether the consent is objectively valid, or instead the product of coercion, deceit, or misrepresentation.

***Commonwealth v. Venable***, 200 A.3d 490, 497 (Pa. Super. 2018) (citation omitted).

> While there is no hard and fast list of factors evincing voluntariness, some considerations include: 1) the defendant's custodial status; 2) the use of duress or coercive tactics by law enforcement personnel; 3) the defendant's knowledge of his right to refuse to consent; 4) the defendant's education and intelligence; 5) the defendant's belief that no incriminating evidence will be found; and 6) the extent and level of the defendant's cooperation with the law enforcement personnel.

***Id***. (citation omitted).

Dolan suggests six reasons militate against a finding of voluntariness:

1) Excess police presence while Dolan was detained;

2) Police use of physical contact on Dolan;

3) Police directing Dolan's movements;

4) Dolan was in custody for several hours and was required to perform multiple tests in different locations;

5) Police asked Dolan confusing questions, potentially as the result of a questionable motive;

6) The initial investigative detention, when looking at all of the available facts, was coercive.

***See*** Appellant's Brief, at 17-24.

To the extent Dolan challenges anything other than the voluntariness of the warrantless blood draw, those contentions are waived. ***See Boutte v. Seitchik***, 719 A.2d 319, 326 (Pa. Super. 1998) (holding that "issues that are not set forth in the statement of questions presented or reasonably suggested

thereby are deemed waived"); *see also* Pa.R.A.P. 2116(a) ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

Dolan fails to cite to any authority for his first five reasons why the warrantless blood draw should be considered involuntary. Instead, Dolan asserts that having three law enforcement officers at the accident scene, a detention of more than an hour along the side of the road followed by two more hours of detention at two more locations, the multiple testing regimes performed on him, the physical directing of Dolan's movements, and suspect statements made to Dolan by one of the officers created the situation where, once Dolan went to the medical center for testing, he was under duress or effectively coerced to consent to the blood draw. *See* Appellant's Brief, at 17-19. As to the sixth reason, that the initial investigative detention was coercive, the gravamen of Dolan's argument is that the initial responding officer, Officer Stere, had nothing more than a legally insufficient "hunch" that Dolan was impaired, but not a reasonable suspicion of the same, so the entire detention was unlawful. *See id*., at 20-21 (pointing to the car accident having been minor and without damage to either vehicle, Officer Stere's recent employment with the police force and lack of DUI recognition training, and Dolan's inability to leave the scene); *see also Commonwealth v. Freeman*, 757 A.2d 903, 908 (Pa. 2000) (citation omitted).

The trial court denied suppression:

> [Dolan's] consent was voluntary. Although [Dolan's] detention was lengthy, much of this time was due to the [drug recognition expert] evaluation, which [Dolan] was not required to complete. When given the option to go to the hospital or complete the evaluation, [Dolan] agreed to complete the evaluation. During the course of the evaluation, [Dolan] did not object to any of the tests, including those that required Officer Shaffer to physically touch [Dolan]. At no point did any of the officers yell, draw their weapons, or threaten [Dolan] in any way. Before the [drug recognition expert] exam began, [Dolan] was read his **_Miranda_** warnings. Although there were three officers involved at some point in the interaction, Officer Houck's involvement was brief and, at the time [Dolan] consent to the blood draw, only one officer, Officer Stere, was present. The DL-26B form read to [Dolan] did not threaten any criminal penalties, but did state that civil penalties could result from a refusal to provide a blood test. Although [Dolan] was not affirmatively told that he did not need to consent, an individual is presumed to know the law and the DL-26B form specifically states that the officer is "requesting a blood draw." Nothing in the form indicates that consent is mandatory. The [c]ourt finds from a review of the totality of the circumstances that [Dolan]'s consent was voluntary.

Trial Court Opinion and Order, 8/24/18, at 13.

We agree with the trial court's findings, as they are supported by the record. Further, the court's legal conclusions do not constitute error. As adduced from his testimony, Officer Stere had more than a "hunch" when he proceeded to investigate Dolan. While Officer Stere obviously did not have a reasonable suspicion of any wrongdoing when he approached the scene of the accident, after observing Dolan's behavior, physical appearance, and disposition, he was able to acquire enough suspicion to proceed with DUI testing. The court did not err in finding that the initial stop was not coercive. None of the actions of the police officers nor any of the temporal or locational

elements of this entire incident contradict the inherent power that Dolan had to reject the blood draw.

Under **Terry v. Ohio**, 392 U.S. 1 (1968), police officers are allowed to stop and briefly detain an individual to conduct a limited investigation "if the officer has a reasonable suspicion, based on specific and articulable facts that criminal activity is afoot." **Commonwealth v. Dangle**, 700 A.2d 538, 540 (Pa. Super. 1997) (citation omitted). Our Commonwealth has established that, while there are no rigid time limits for these types of investigations, the key factor in analyzing if a "detention lasts too long to be justified as an investigative stop, is whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." **Commonwealth v. Ellis**, 662 A.2d 1043, 1048 (Pa. 1995) (quotation marks and citation omitted). Unless a traffic stop becomes the functional equivalent of an arrest, ascertained by the totality of the circumstances, a traffic stop typically constitutes an investigative detention. **Commonwealth v. Kiner**, 697 A.2d 262, 265 (Pa. Super. 1997).

Although the entire course of events, taking place at three different locations, lasted for some time, we see no basis to conclude that the police and specifically Officer Stere acted with anything other than diligence in this situation. First, Officer Stere's questioning of Dolan took place on the side of an active public highway, implying that it was not custodial in nature. Second,

because this was an automobile accident, Officer Stere had other safety-related and fact-finding obligations. Among other tasks, Officer Stere had to take Dolan's information and make sure he was uninjured, which necessarily required conversation amongst the two. Third, Officer Stere did not handcuff Dolan nor use or threaten to use force during the initial investigative phase.

Officer Stere's reasonable suspicion of Dolan's impairment stemmed from his normal "course of action" duties associated with his handling of the car accident scene. In his attempt to obtain Dolan's side of the story, Officer Stere remarked that he seemed "confused, dazed." N.T., Suppression Hearing, 2/16/18, at 11. Officer Stere stated that Dolan "looked like he was just staring off into space" and "was on the nod. His eyelids were droopy. He was having a hard time keeping his eyes open. He was unable to tell [Officer Stere] what happened during the crash." *Id*. Further, Dolan's story as to where he was traveling did not make geographic sense. *See id*., at 13. Resultantly, Officer Stere was "concerned that [Dolan was] under the influence of some kind of controlled substance." *Id*., at 12.

It is unrefuted that well over half an hour passed between the arrival of Officer Stere and the third officer who ultimately conducted the DUI testing on Dolan. *See* Appellee's Brief, at 20. However, there is nothing in the record to objectively conclude that Dolan was under custodial detention prior to the DUI testing or that Officer Stere or the second officer lacked diligence in bringing this third officer to the scene.

Officer Stere and the second officer were not trained to do field sobriety testing. Therefore, the only way to act upon Officer Stere's reasonable suspicion was to find an officer who was qualified to handle the incident, which they did as quickly as was possible under the circumstances and in conjunction with their other attendant responsibilities. *See Commonwealth v. Douglass*, 539 A.2d 412 (Pa. Super. 1988) (finding that a three and one half hour detention, under the totality of the circumstances, was investigative rather than custodial).

As to whether there was probable cause to arrest Dolan, "[p]robable cause for an arrest exists where the facts and circumstances within the officers' knowledge are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed." *Commonwealth v. Stultz*, 114 A.3d 865, 883 (Pa. Super. 2015) (quotation marks and citation omitted). Here, we find that Officer Stere's observations in addition to Dolan's unsatisfactory performance on the field sobriety test provided the officers with enough to establish probable cause for an arrest.

When Dolan was transported to the second location for additional testing at his behest, he was *Mirandized* prior to the evaluation, did not object, was not handcuffed, and was not threatened. *See* N.T., Suppression Hearing, 2/16/18, at 39, 43-44, 48, 75-77, 79, 81-82, 109.

At the third location, the site of the blood draw, Officer Stere read the DL-26B form to Dolan verbatim. *See id*., at 18. Dolan "agreed to a blood draw

and signed the form." *Id*., at 19. Dolan was not handcuffed, Officer Stere did not raise his voice at him, and the officer made sure that Dolan knew he was available to answer any questions Dolan may have had. *See id*., at 19-20. Further, the relevant form clearly indicates that it is merely making a noncompulsory "request." *See* Commonwealth's Ex. 1. While Dolan was under arrest at the time of the blood draw, nothing in the record indicates that Officer Stere nor any other officer used any coercive tactics to compel Dolan to give in to blood testing.

Therefore, based on our independent review of the record, we can find no error or abuse of discretion in the trial court's conclusion that the totality of the circumstances weighed in favor of finding that Dolan provided knowing and voluntary consent to the blood draw. Although Dolan was in custody at the time of the blood draw, there is no objective evidence to suggest that his consent to such an act was the product of duress, threats, or coercion on the part of the police officers. After being read the information contained on the DL-26B form, Dolan agreed to submit to the test and underwent the blood draw. Accordingly, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/07/2019

- 13 -